Our next case of the morning is one two zero two three two in re M.I. People of the state of Illinois versus J.B. Ready to proceed. We read. Good morning. Please support. I'm assistant attorney general Dan Hartwick. On behalf of the petitioner upon people of the state of Illinois, this appeal arises from a divided opinion of the third district health court reversing the juvenile court order terminating the parental rights of J.B. For his failure to maintain reasonable interest, concern, or responsibility as a welfare scholar and for his failure to make reasonable progress toward M.I. And so ruling the appellate court majority misinterpreted the relevant sections of the adoption act, ignored established case law, and misapplied the facts of the case, ultimately substituting his judgment for that of the juvenile court. Because the facts of the record in this case support the juvenile court's findings, the people ask that this court reverse the opinion of the appellate court majority and reinstate the juvenile court's termination order so that the best interests of M.I. may be served and her adoption may proceed. Additionally, the people request that this court clarify the requirements of sections B and M of the adoption act, 1B of the adoption act, to assist in future uniform application. In order to terminate parental rights, the state must follow a two-step process pursuant to the juvenile court. The first step is at issue in this case, and that requires a finding that the parent is unfit as to find in section 1 of the adoption act. The state carries the burden of proving any one of the discrete grounds of unfitness alleged by clear and convincing evidence. Proof of any single ground under the act is sufficient to support a finding of unfitness by the juvenile court. Review of the juvenile court's fitness determination is a question of fact and must be upheld unless it is against the manifest weight of the evidence. The juvenile court is granted wide discretion in coming to its conclusion, not only because it observes the witness's demeanor and assess credibility, but also because of the delicacy and difficulty that these kinds of cases present. Before considering the facts of this case, the court should consider the language of sections B and M and the appellate majority's treatment of these sections. Interpretation of these sections is a question of law that is reviewed to know. The majority led its analysis by stating that it could not accept the juvenile court's determination that failing to complete a task that is beyond one's intellectual capacity is the same as refusing to comply with order directives and willfully not making reasonable progress or willfully failing to maintain a reasonable degree of interest. Jamie asserts that these comments were mere dicta and not relative to determination analysis, but it is difficult to separate these comments from the analysis the way the opinion is written. This is especially so as the majority continue to then state that the legislature recognized that there are situations where intellectual disabilities or illnesses may render a parent unfit by promulgating subsection P of section 1. It then claimed that the state, however, failed to allege subsection P and proceeded to consider reasonable interest and reasonable progress with J.B.'s intellectual capacity as a guided, almost singular factor considered. The problem is that the plain language of sections B and M is straightforward. They do not contain a willfulness requirement. They do not carve out any exceptions or limitations due to a parent's intellectual disability. The treatment of these sections by all districts of the appellate court have uniformly rejected the reading of such a requirement of the fall of the willfulness into these sections. Mr. Hartwig, the appellate court said that the trial court didn't take into consideration the mental disabilities. Was there anything in the record that would be otherwise, that the judge did articulate something regarding the mental disabilities of the respondent? Yes. During the rendering of this oral opinion, the tribunal court did note that J.B. is intellectually limited with a low IQ. He recognized that fact, but then he continued on to address the facts of the case, which I'll get to a little bit later. But he continued to address the facts of the case and said that those overcame the circumstances and the problems that he faced due to his disability. Now, for the different sections, the state has discretion to determine which sections to proceed upon. Because subsection P involves the parents with disabilities, it does not mean that the state cannot proceed on other grounds if there is a parent with a disability. The state can still, as in this case, proceed on B and M instead of P. Moreover, it does not graft requirements of subsection P onto the other ones. Again, these are separate and distinct sections. So to the extent that the majority opinion did announce such a requirement, people asked that this court reject that and clarify that those sections do not contain such a requirement. Getting to the facts of the case, the tribunal court's judgment that J.B. failed to maintain a reasonable degree of interest, concern, or responsibility is not as manifested by the evidence. And coming to a conclusion on this issue, courts consider whether the parent's actions to maintain the interest, concern, or responsibility, whether the actions were objectively reasonable. You do consider the actions in context of the circumstances. But again, there is no fault, there is no willfulness requirement. There is no time frame for this subsection, so the entirety of the evidence is at issue. Wasn't there an allegation that the judge decided the issues outside of time frames? There is. The time frame is a constraint to the reasonable progress count. The reasonable degree of interest, concern, or responsibility does not have such a limitation. The reasonable progress has a time frame limitation. Was there a service plan prepared for J.B.? There is not one on the record. There's none on the record? No. I do not know if one was and is not on the record, but there was not one prepared on the record. Wasn't that an allegation that the judge, or a discussion the judge had with the respondent because he did not contact the caseworker or give an address? Correct. There is ample evidence of interaction between J.B. and the Department of Children and Family Services and other agencies. With regard to the service plan was not available to him because he didn't work with the caseworker, is what I'm asking. Correct. There's ample evidence of interaction and discussion, but the court said J.B. did not follow up on any of that, such that no service plan could be. Created because he didn't get to that next step. He failed to take the proper steps to get to the point where they could create a service plan to help or work with him. And that's what the court said for that. If the state proceeds under the provision, reasonable degree of interest, concern, or responsibility, is the state in effect saying that the parent could meet expectations with appropriate services? I'm just going to get your question straight. You're saying that proceeding under subsection B, that it assumes that with services they could meet reasonable expectations? I think they would operate under that assumption for anyone at the start. Otherwise, there's no reason for a service plan. I think there's an assumption that there's a fundamental right to care for the children. And then, when people are having issues, then they create a service plan and believe that there's an assumption that if it's followed, they will then be able to care for the child. Does that answer your question? Yes. Getting back, for the three parts of subsection B, interest, concern, or responsibility, any one of the three elements are sufficient for an unfitness finding. Cases have found parents unfit for continued drug addiction, for infrequent visitation, failure to file court directives or service plans, singular elements. For this case, there's evidence that there was no reasonable degree of interest or concern exhibited by J.B. Visitations were regularly arranged. Initially, he was given bus passes. He attended some visitations. Then, according to the record, he used bus passes for other purposes. He started missing visitations, so those bus passes were taken away. In the last two years of the reporting period, there were a total of four visits with M.I. There's no evidence of J.B. exhibiting concern that M.I. became distraught over the missed visits. M.I. was excited to visit initially with J.B. As the time period went along, he began skipping visits. She threw tantrums, damaged her room. She ultimately had to undergo therapy to help deal with her anger and emotional issues because, according to the record, specifically because the visits were skipped. Were these visits supervised? They were supervised. By whom? The caseworker was supervising. There's notation in the record that it could not be the mother who supervised the visits with J.B. It had to be somebody else. Those actions alone support the finding of unfitness. That is not a reasonable degree of interest or concern, visiting your daughter so infrequently. Also, not visiting and causing your daughter emotional stress, not caring about it or expressing concern about it. Also, there's evidence that there's no reasonable degree of responsibility. Again, the caseworker tried to set up services with a health service agency. Tried to set up drug drops for him to do drug testing and drug counseling. J.B. indicated that he used drugs. He wouldn't stop. He said he might go to the classes, but he wouldn't stop smoking marijuana. This is not a reasonable degree of responsibility for the child. His refusal to stop using drugs and to take advantage of the services that the caseworker was trying to set up. Now, J.B., despite the fact that bus passes were taken away, J.B. managed to commute and attend almost every permanency hearing. He failed to acknowledge and fully deal with his mental health and drug issues. He tries in different courts to lay blame on the state. However, as I said, he participated in the permanency hearings. He attended. He was able to navigate the bus system. Those are not reasons to overcome juvenile court's funding. Accordingly, on this issue, the juvenile court's funding for fitness should be affirmed. The juvenile court's ruling that J.B. failed to make reasonable progress is also supported by the record. This has a nine-month period. And that was stated August 1, 2013 to May 1, 2014. The third district kind of succinctly said that they disagreed that the circuit court properly considered the evidence in this case because it did not specifically disclaim evidence that was outside of the nine-month period for this issue. However, as I said, the reasonable interest prong has no time frame. So there was evidence presented. In addition, the fitness hearing involved the mother and father of my half-sister. So evidence was presented for multiple parents and multiple issues and multiple periods of time. And the record supports the fact that the trial court properly considered the evidence for this case. The state specifically stated the time period in their petition. The parties repeated the applicable dates during the argument. The juvenile court repeated the applicable dates prior to entering its ruling. And then the appellate court noted that the people argued this. Again, an appeal that the evidence was properly considered and yet disagreed. J.B., in his brief, asserts that this issue was waived. But as the appellate court noted in his opinion, the people made this argument again on appeal. And there was no waiver or concession on this issue. Accepting the statement of majority on this issue is problematic because it creates a presumption of error on the part of the juvenile court that despite making all these statements, it's a presumption that the court did not properly follow the law or consider the proper evidence. And that's problematic. More importantly, as to the evidence, the juvenile court's decision was not against the manifesto evidence. Reasonable progress is measured again by the objective standard based on the stated 9-1-1 period to determine whether a minimum measurable or demonstrable movement toward that goal is met. This includes consideration of cooperation of the agency, caseworkers, court directives, search claims, and other facts or incidents that arise in the course of the case that require the parent's attention. Intellectual capacity can be relevant, but again, there's no willfulness or fault requirement in the statute. And what must be considered is whether or not a movement toward the end goal of the child returning was made. And if that's not even possible, then this element is bad. If there's no service plan in the record, how do we know what he was told his expectations would be? It can be based off a service plan. It can be based off directives of the court. In this case, the court directed early in the case, directed JB to cooperate with DCFS to undertake drug testing, drug classes, parenting classes, mental health examination, or several classes. So it's in the record, what the judge told him. Correct. The judge tried to get him to do drug testing, go to drug class, go to mental health services. He, again, flatly failed to do this and indicated he would continue using drugs. And he made zero progress in this nine-month period. For that reason, the Tribunal Court's judgment on this issue is not in its manifest way. If there are not any further questions, for these reasons, we ask that this Court reverse the majority opinion and reinstate the Tribunal Court's termination order so that the best interests of MI may be served and adoption completed. Thank you. Thank you. Good morning, Your Honor. Good morning. May it please the Court, counsel? My name is Susan O'Neill. I'm from Peoria, Illinois, and I am court-appointed counsel for the respondent father, the appellee JB, in this case. I'm asking the Court today to affirm the decision of the Third District Appellate Court and find that the Third District correctly found that the State failed to meet their burden of proof as to the parental unfitness in the termination of the respondent father JB's parental rights. The only two grounds for parental unfitness relating to JB were the subsection B, failure to maintain a reasonable degree of interest, concern, and responsibility as to the child's welfare, and subsection M2, failure to make reasonable progress during the return home with a minor during the time period of August 1, 2013 to May 1, 2014. The State called only one witness, the caseworker, Ms. Brenda Lee, as to the paragraph B, the alleged failure of the respondent father to maintain a reasonable degree of interest, concern, and responsibility as to the child. The only topic that the State elicited testimony about was visitation. However, many cases, including the Daphne case, have discussed that there are other ways of potentially showing their interest, concern, or responsibility, such as paying child support, such as purchasing gifts, and other things like writing letters and sending cards, which in this case I think would have proven to be very difficult. Because of the intellectual disabilities of the respondent father, having an IQ of 58, which the appellate court likened to the intellectual capability of a kindergartner, and the fact that the psychological said he was functionally illiterate. Was there any evidence in the record regarding cards and other interests? The State did not ask any questions other than about his visitation. So there was no evidence in the record one way or the other. And the defendant didn't put on any witnesses? He did not in the first part. No, he did not. There was vigorous cross-examination, and it should be noted, something that the State has continually failed to mention in this case, is that both parents were initially found fit, and the child remained in the mother's custody until October 30th of 2013, despite the fact that the case opened in 2010. So we also don't know whether or not, looking at the factors of in-race sick, one of this court's cases from 1990, there are different factors to be considered, such as the parent's difficulty in obtaining transportation. We know he was homeless and lived many miles from Peoria, where the visits were going to be held. A parent's poverty. We know he had no income. Actions and statements of others that hindered or discouraged visitation. We don't know whether or not the mother, for those three years, did she let him see the child? Did she prevent him in some way from seeing the child? Certainly the bus pass issue, which the bus passes, the caseworker testified she quit giving him to him in February of 2012. That could have been an action that hindered his ability to visit. And the last factor is whether the parent's failure was motivated by a need to take care of other factors that were going on in their life, or whether it was a true indifference. Do you agree that there is this record information that the judge actually took all of this into consideration, his mental health issues, and some of the things that he didn't do? No, Your Honor, I disagree with that. And I did represent him in the termination proceedings at the trial court level. There's nothing in the record that the judge talked to him about? There was a very cursory ruling, actually. He stated that I understand that he has a mental deficiency, but I believe that his lack of interest and his failure to show up, I believe it was about three or four sentences. It was not a lengthy discussion at all. He discounted that because of what he deemed to be indifference, which, as the amici in their brief noted, a scholarly study from the Harvard Law Review, talking about caseworkers who often have either a lack of training or a lack of experience in working with parents with intellectual disabilities often perceive some of their actions or mannerisms as being indifferent or hostile when that's clearly not the case. It's a lack of ability to articulate some confusion or frustration with that lack of understanding that has a shyness and uncertainty that can be viewed as indifference or hostility when that's truly not the case. Ms. O'Neill, the trial court took, or the appellate court took exception with the trial court not looking into whether the respondent was willfully not making progress. That isn't something that should be considered. Is it the willfulness of not making progress? The progress, of course, argument is a little bit different argument because as we're all aware, as opposed to reasonable efforts, the reasonable progress part of subsection M talks about is evaluated under an objective standard. However, the appellate court, the third district, cited the case of NRAAA in which the state didn't mention by name but acknowledged that that case did say that despite the fact it was an objective standard, the reasonableness of the progress had to be evaluated in light of the circumstances of the case. I think that that's where... Well, it's... Willfulness was dictated. I don't believe that they did intend to grab... It's important, though, isn't it? I mean, there's a difference between willfulness being required and an objective standard. I mean, you'd agree with that. I do agree with that. So it would seem that at least that's important to straighten out. And another thing, in a similar vein, they indicated that the trial court, the appellate court indicated that the trial court didn't look into how the mental impairment affected reasonable progress. And that's not a requirement, is it? Well, it isn't, but we cited in our brief the case, the third district case of NRAAA-OS. And in that case, it stated that the parents, it noted, again, it's something the state has not mentioned yet either, that the parents have a constitutional right to parent their children, so to deprive them of that right, there needs to be a concern for the integrity of the judicial process and confidence in the fairness of our courts. And I think that that's... Using AA and OS, it's not saying that there has to be... I think it was dictated, and I think the word was misplaced. I don't think there is a wilfulness involved. But to say objective standard doesn't mean that we should not consider the circumstances of the case. AA says we should. And OS says that there has to be some fundamental fairness and a concern for the integrity of the process. And I think it's important to note that this case is not just about JV. There are many parents similarly situated in the fact that they have intellectual disabilities, that they have a mental illness, that they're homeless. JV just happened to have all three of these things. But this decision that you make today on this case is going to affect all of these classes of people. And again, the statistics that... Go further, though, right? In addition, affect the children of all these groups of people. Correct. But to count them out without looking at the services as was required by the psychological evaluation, which, by the way, was done in 2011, three years before the state filed their termination petition, these modifications, you don't even have to... You don't even have to go to the VA or the Rehabilitation Act or the homeless position we did in our original brief. But you don't even have to necessarily go there. The fact that the court-ordered psychological evaluation done in 2011 told the trial court, told the caseworker, you have to modify this man's services. You need to do further assessment on his adaptive functioning skills and his independent living skills before you can really know whether he can parent his child. The question is, we don't have enough information to know whether J.B. could parent his child. The psychological evaluation said he could not parent independently. The MECI bring up a good point that co-parenting was never even explored, whether there was a friend or a relative that could live with him. There's nothing that says that a parent has to be able to live alone and parent their child, whether there are any community agencies that assist with independent living, one-on-one parenting class with the child present. None of those things were explored by the caseworker, perhaps because the child was with the mother. I don't know if that was the lack of urgency here, but the state waited four years after this case was opened to file their termination petition. The state points to the fact that, well, the best interest of the child is paramount, but where was the best interest of the child when you're waiting four years to file your termination petition? Ms. O'Neill? With regard to that, I'm just looking at the record, and there's about eight paragraphs in which the judge does talk about what the respondent has done and what he hasn't done, and that the court did look at the psychological. And the argument about waiting four years might be to the benefit of the respondent in many ways, because it was him that maybe not willfully, but did not cooperate with the caseworker where his address was. According to the judge, you didn't let the caseworker know where you live. You would not... You know, she couldn't maintain contact with you regarding services. If you were unwilling to give her information, she would say, hey, this is the judge's quote. So what I'm just saying is that sometimes maybe the four years might have been in his interest to wait as long as they could to give him a chance. Well, I could see where that could have been the case, but the judge is actually, and the state as well, misstating the caseworker's actual testimony. Again, there were no service plans filed in this case. And the state incorrectly states that that was due to... There's nothing in the record to indicate that these service plans were not prepared. They weren't filed, so the appellate court determined that there's no evidence that they were prepared at all, but there's nothing in the record to suggest they could not be prepared or that they even weren't prepared. They just were never filed as required by the statute. But there's nothing to suggest that the respondent did not cooperate, but actually he did cooperate in the integrated assessment, something that's done early on in the first few months of the case, as is the first service plan required. I asked that that be taken judicial notice of at the termination proceeding, and that was denied, but there was full acknowledgement that that document existed, that he cooperated with that lengthy interview. He actually did. He did have an address, a mailing address for him, that she had a message phone number for him, and the state mentions in one of their briefs that she even took the child to Pekin one time to see the respondent father. So the fact that she couldn't get a hold of him and he wouldn't say... She had a phone number. She had a mailing address. He did not have stable housing, was couch surfing, staying with someone, and he said that he did not have permission to give her his address of where he was staying. But I think that's a red herring because they were never looking at placing the child there. Usually when they want the actual address, that's because they want to do a home visit to see whether this would be a suitable residence for a child. The child was living for the first three years with the mother. They were never looking at the father as a placement, and certainly after the psychological, it was as though the father just really wasn't even a factor anymore. And the state is also wrong to say that this caseworker went out of her way and arranged all these services. She arranged no services. That's what the appellate court said. She gave him some names of some places he might go. She told him to go back there. Well, the evidence at trial, her testimony was she knew he was back there, and she had a signed release from him to get that information. But when I asked her, she said, I didn't get it. Are you saying the judge was incorrect when he stated on the record that between August 1, 2013, and May 14, 2014, that he did not go to the integrated assessment? The integrated assessment had been done, yes. There was a document. But that he didn't attend. Are you saying the judge is incorrect on that? Yes. The document was done. He had to have attended. That's why I asked for him to take judicial notice of it. The state objected, and he sustained their objection. So the judge is wrong in that record. The judge says he did not attend. Is there any argument here that DCFS didn't make reasonable accommodations for an intellectually disabled parent? Yes. To what lengths should they have gone? Or what would be required? Well, two things. One, the caseworker testified that she had had training on this, and that she was aware that DCFS had a resource or liaison person for caseworkers who knew about the specifics of the case to work together to determine what accommodations or modifications needed to be made. Secondly, we have the psychological evaluation, which was done in 2011, very early in the case, that was very clear that all services had to be modified, that even the parenting class, which, by the way, the respondent father did complete a parenting class, but the caseworker testified at the termination proceeding that she did not look at the curriculum, she did not know what topics it covered, and she did not know whether it was appropriate for someone with an intellectual disability. But the psychological indicated that those kinds of services had to be broken down, given examples that there had to be modifications of every single service, and that further study needed to be done, an adaptive functioning test to know exactly what modifications. So had she utilized that person and gone over the psychological, the recommendations from the psychological, I think we would have known exactly what modifications. But we did raise that both at the trial court level and in our original appeal. You know, in this case, of course, I'm the FLE. I was responding in my brief here simply to the arguments made by the appellant in this case. But this case is affecting many parents. The statistics cited by the amici, the 80% of parents with intellectual disabilities will have their parental rights terminated. That's staggering, and it's not fair. If there's no other questions, I thank you for your time. Thank you. I'd just like to make a couple points.  There's been no real legal argument countered in our case. And the facts I presented, I believe, demonstrate this decision is not consistent with the state of the evidence. Counsel noted that both parents were originally found to be fit. It wasn't until 2010, and it wasn't until 2013 that the termination petition was filed. And over the course of these cases, and as you mentioned in the argument, other factors arise, other actions of the parents arise that need to be considered and dealt with. And no one is static for a long period of time. You can improve, and you can decline the abilities of meeting responsibilities. In this case, they were originally found fit, but the permanency hearing orders throughout the course of the proceedings that were taking judicial notice of them, each one indicated that reasonable efforts were not made by JV. Reasonable efforts were made by DCFS, according to those orders, and the attendant agencies that were involved. Each order indicates that. There was no objection of record during the entire period to those findings. Until the fitness hearing at the end, when the argument was made that the services were not allowed. There was argument that only one witness was presented, and only evidence on visitation was presented. That was one of the focuses of the testimony, but as I addressed, the lack of visitation was one issue, but that created other issues. That created problems for Emma. It created emotional problems. She had to get therapy to work through her anger and other attendant issues because the visitation was not followed up by JV. There's no evidence of any roadblocks or discouragement by Mother, by DCFS, by any other agency to JV's getting things done they needed to get done. That is one of the factors to be considered if there is no evidence of record that he was discouraged or stopped from meeting his responsibilities. The question was asked, what is required in this situation? There is no specific requirement in this case. As we addressed, the JV had a tribunal court address. JV did not do enough for the agency to detail the point and then to modify the point. As the tribunal court stated, if he doesn't show up, what can the agency do? It gets to the point, is there a requirement to go get him, to bring him in, to force him to do things? There's certainly no legal requirement for the agency to do that. Without him showing up, without him taking any active interest, there's nothing that they could have done. Again, the tribunal court considered the factors, the evidence. It was presented that he did not take these actions, that the elements were met. And then one final issue, counsel noted, this is not just about JV, the willfulness requirement. There certainly are other parents with disabilities that are facing this issue. There's also other parents who don't have disabilities or have other issues where counsel or the kids are facing the problem. It's a problem for everyone. It's a delicate, difficult issue. And if we draft other requirements on the statute, then the attorneys and tribunal courts who are dealing with this on the ground every day are going to start having problems applying this in a uniform fashion. And then it will create other issues that it's not going to rectify. So, the public court's legal analysis, in this case, has not been defended. Fact-specific issues have been raised. JV, according to the facts on the record, JV has not come close to making it clearly evident that the circuit court erred and was against the manifesto of the evidence. Accordingly, we ask you to reverse the majority opinion and reinstate the tribunal court's determination. Thank you very much. Thank you. Case number 120232, Henry M.I., people of the State of Illinois v. J.B., will be taken under advisement as agenda number seven. Mr. Hartwig and Ms. O'Neill, thank you for your arguments this morning. We excuse you at this time.